IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:13-CR-9 |
| | ) | |
| ROCKY JOE HOUSTON, | ) | (REEVES / SHIRLEY) |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court

as may be appropriate. This case is before the Court the Defendant's three motions to suppress

evidence obtained from a pole camera: Motion to Suppress Illegally Obtained Pole Camera Footage

[Doc. 29], filed on February 27, 2013; Motion to Suppress No. 1 [Case No. 3:13-CR-10, Doc. 14],

filed by the Defendant's brother Clifford Leon Houston on February 15, 2013, and adopted by the

Defendant on March 15, 2013; and Motion to Suppress No. 2 [Case No. 3:13-CR-10, Doc. 16], also

filed by the Defendant's brother on February 15 and adopted by the Defendant on March 15. The

Government filed a response [Doc. 34] to the Defendant's *pro se* motion on March 13, 2013.

On March 15, 2013, the Court held a motion hearing on all pending pretrial motions.

Assistant United States Attorney David C. Jennings represented the Government. The Defendant

represented himself with the assistance of elbow counsel, Attorney Norman D. McKellar.[1] At that

---

[1]At the conclusion of the hearing, the Court granted [Doc. 37] the Defendant's request to
remove elbow counsel.

time, the Court permitted[1] the Defendant to adopt two suppression motions relating to the pole camera in question that were filed by the Defendant's brother Clifford Leon Houston ("Leon Houston") in case number 3:13-CR-10. The Government adopted its response to those motions that it filed in Leon Houston's case. [Case No. 3:13-CR-10, Doc. 33].

On April 8, 2013, the Defendant filed a Second Supplemental Motion to Suppress [Doc. 46] alleging reasons to suppress the video footage obtained from the pole camera. The Government responded [Doc. 48] that the Court should deny this motion as untimely. Although the Court agrees that the February 27, 2013 motion-filing deadline is long expired, the Defendant's Second Supplemental Motion is more in the nature of a legal memorandum, and it merely restates and perhaps expounds upon oral arguments that the Defendant made March 15 hearing. Accordingly, the Court ruled [Doc. 51] that it would consider the Defendant's supplemental filing despite its untimeliness and gave the Government one week to file a response, if it chose. On April 16, 3013, the Government responded [Doc. 54] to the Defendant's Second Supplemental Motion to Suppress. The Court took the suppression issues under advisement on that day.

## I. POSITIONS OF THE PARTIES

The Defendant is charged [Doc. 7] with fourteen counts of being a felon in possession of a firearm on the following dates: October 11, 15, 20, 23, 24, and 25, 2012; November 5, 14, 16, and 20, 2012; December 14, 19, and 22, 2012; and January 11, 2013. According to the affidavit of

---

[1]At the March 15 hearing, the Defendant asked to adopt the motion to suppress the warrantless pole camera footage filed by his brother in case number 3:13-CR-10. The Court permitted [Doc. 38, p.2] him to adopt this motion and the motion to suppress the evidence gained from the pole camera during the time that it was authorized by a search warrant.

2

Special Agent Jason Dobbs supporting the Criminal Complaint [Doc. 3] filed in this case, on October 9, 2012, agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF) installed a pole camera on a public utility pole[2] adjacent to 391 Barnard Narrows Road in Ten Mile, Tennessee, which was the former residence of the Defendant's father Clifford Clyde Houston and the current residence of the Defendant's brother Leon Houston. The camera had a view of the rear of the mobile home residence at 391 Barnard Narrows Road and the surrounding fields and roads. Agent Dobbs' affidavit states that the pole camera recorded the Defendant holding firearms on October 11, 15, 20, 23, 24, and 25, 2012.

On December 19, 2012, the ATF obtained a Search and Seizure Warrant, authorizing the "search of the following person or property located in the Eastern District of Tennessee" identified as "the real property on which lies residences located at 373 Barnard Narrows Road, Ten Mile, Tennessee, 391 Barnard Narrows Road, Ten Mile, Tennessee, and 412 Barnard Narrows Road, Ten Mile, Tennessee, through the continued use of and recording by a video camera installed on a public telephone pole." [Exh. 1][3] On January 11, 2013, ATF obtained search warrants for Houston family

_____

[2]The Defendant maintains that the pole camera was installed on his property, but to date, he has offered no proof of such. The Government contends that the pole camera was installed on a public utility pole located on Dogtown Road near the Houston family property. Neither party presented any evidence at the March 15 hearing. Nevertheless, the sworn affidavit of Special ATF Agent Jason Dobbs [Exh. 1, p.10, ¶14] states that the "camera was installed on a public utility pole[.]" Based upon this affidavit, which is the only evidence the Court has before it and which has not been rebutted by the Defendant with any sworn testimony or other evidence, the Court finds that the pole camera was installed on a public utility pole and not on the Houston family property. The Court also notes that this finding comports with the testimony of Agent Dobbs at the Defendant's brother Leon Houston's suppression hearing on April 16, 2013.

[3]The relevant search warrants and supporting affidavits were filed as exhibits to Defendant Leon Houston's suppression motions in case number 3:13-CR-10. For ease of reference, the Court will refer to them as follows: Exhibit 1 is a sixteen-page document containing a Motion to Seal and Sealing Order, a Search and Seizure Warrant, an Application for

property at 373 Barnard Narrows Road (Defendant's primary residence) [Exh. 2], 391 Barnard Narrows Road (the Defendant's brother Leon Houston's residence) [Exh. 3], and 412 Barnard Narrows Road (the Defendant's daughter Rachel Houston's residence) [Exh. 4]. These search warrants were executed on the evening of January 11, 2013, and firearms and ammunition were seized from the Defendant's residence at 373 Barnard Narrows Road.

The Defendant calls for the suppression of all evidence seized as a result of the video footage from the pole camera. He argues (1) that the video footage from October 9 through December 19, 2012, was illegally obtained without a search warrant in violation of the Fourth Amendment. He also contends (2) that the December 19, 2012 search warrant authorizing continued use of the pole camera was invalid because it was not signed by a neutral and detached judge and was not supported by probable cause. Finally, he contends (3) that the January 11, 2013 search warrants for the three residences on the Houston family property were invalid because the search warrants were issued without probable cause. The Court will address each of these arguments in the analysis below.

The Government responds (1) that no warrant was necessary for the use of a pole camera to view the curtilage of the Houston family property because it is an area that officers could view from

---

Search Warrant, and a supporting Affidavit all relating to the authorization of a pole camera on December 19, 2013 [Case No. 3:13-CR-10, Doc. 15-4]. Exhibit 2 is a twenty-five-page document containing a Search and Seizure Warrant for 373 Barnard Narrows Road (the Defendant's primary residence) dated January 11, 2013, an Application for Search Warrant, a Search Warrant Return, Property Receipt/Release forms, an Affidavit supporting the search warrant, and photographs [Case No. 3:13-CR-10, Doc. 15-1]. Exhibit 3 is a twenty-three-page document containing a Search and Seizure Warrant for 391 Barnard Narrows Road (Clifford Leon Houston's primary residence) dated January 11, 2013, a search warrant return, Application for a Search Warrant, a supporting Affidavit, and photographs [Case No. 3:13-CR-10, Doc. 15-2]. Exhibit 4 is a twenty-two-page document containing a Search and Seizure Warrant for 412 Barnard Narrows Road (Houston family property that is the residence of Defendant's daughter) dated January 11, 2013, a search warrant return, an Application for a Search Warrant, a supporting Affidavit, and photographs [Case No. 3:13-CR-10, Doc. 15-3].

4

a legal vantage point and that ATF agents acted in good faith in seeking and procuring a search warrant on December 19, 2012, for the continued use of the pole camera, after the Court of Appeals for the Sixth Circuit questioned, in dicta, the constitutionality of extended warrantless video surveillance of curtilage. The Government also contends (2) that the December 19, 2012 search warrant authorizing the continued use of the pole camera was issued by a neutral and detached magistrate and based upon probable cause and that probable cause would support the issuance of the December 19 search warrant even absent any evidence gained from the pole camera. The Government maintains (3) that the January 11, 2013 search warrants were also based upon probable cause.

Finally, the Government asserts that if the Court finds that the warrantless video surveillance of the Defendant's property violates the Fourth Amendment and that the search warrant affidavits based upon this evidence lack probable cause, then the exclusionary rule should not be applied in this case because the agents acted in good faith, relying on the fact that no court had required a search warrant for video surveillance of unobstructed curtilage prior to December 19, 2012.

## II. ANALYSIS

The Fourth Amendment requires that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established

and well-delineated exceptions." Katz v. U.S., 389 U.S. 347, 357 (1967) (footnotes omitted). "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy." California v. Ciraolo, 476 U.S. 207, 211 (1986).

The Defendant seeks to suppress all evidence resulting from (1) the warrantless use of a pole camera to observe the Houston family property from October 9, 2012, to December 19, 2012; (2) the continued use of the pole camera to monitor the Houston family property pursuant to a December 19, 2012 search warrant; and (3) the search of the three Houston family residences[4] on January 11, 2013. He argues that the warrantless use of the pole camera violated his rights under the Fourth Amendment and that the subsequent search warrants which were issued based upon earlier "warrantless" video footage from the pole camera are invalid. The Court examines each of these issues in turn.

**A. Use of Pole Camera from October 9, 2012, to December 19, 2012**

The Defendant argues that ATF agents conducted a warrantless search of Houston family property by installing a pole camera on an adjacent utility pole and monitoring the video footage from this camera from October 9, 2012, through December 19, 2012. He argues that he has a legitimate privacy interest in being free from warrantless video surveillance. He also contends that the length of the video surveillance (10 weeks) was unreasonable. He maintains that no exigent

_____

[4]The Defendant's contention that the Court should suppress *all* evidence resulting from the warrantless pole camera surveillance presumably extends to evidence seized during the searches of the residences of his brother (391 Barnard Narrows Road) and his daughter (412 Barnard Narrows Road) as well. Whether the Defendant has standing to challenge the searches of residences other than his own is an issue in this case.

6

circumstances existed to prevent ATF agents from seeking a search warrant for the installation of the camera. Finally, he argues that the video footage from October 23, 2012, reveals that agents zoomed in on his neighbor, who was not a subject of their investigation. He contends that the agents' actions of "spying" on his neighbor demonstrate that they were not acting in good faith in conducting the warrantless video surveillance.

The Government responds that the use of a pole camera to conduct video surveillance of the Defendant's curtilage is not a search within the meaning of the Fourth Amendment because agents could lawfully view the Defendant's property from the public location where the camera was installed. The Government argues that at the time the pole camera was installed, officers could view the Houston family property from two public roads. It contends that the Defendant's property was not fenced and that, in fact, the Defendant and his brother invited the public to view their property by erecting billboards on their property twenty yards from the road. Finally, the Government contends that although the pole camera had a zoom function, it was continuously focused on the property and activities of Rocky and Leon Houston. This includes when the Defendant was observed with other family members, as occurred on October 23, 2012.[5]

*(1) Standing*

Although not raised by the parties, the Court turns first to the question of whether the Defendant has a recognized privacy interest in the area filmed by the pole camera or what is

---

[5]The Government states [Doc. 54] that the camera may have occasionally recorded the front of the Johnson residence but that the focus of the investigation was on the Defendant's possession of firearms. In this regard, the Government notes that the front of the Johnson residence can be viewed by anyone driving along Dogtown Road.

commonly known as "standing" to challenge the alleged warrantless search. See United States v. Ellis, 125 F. App'x 691, 696 (6th Cir. 2005) (holding that it is "incumbent" upon the court to determine whether a party has "standing to challenge the constitutionality of the officers' actions[,]" even when the issue of standing is not raised by the parties). In order to contest whether a search comports with the Fourth Amendment, the defendant must have "a reasonable expectation of privacy" in the location searched. Rakas v. Illinois, 439 U.S. 128, 143 (1978). "It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001). Whether the defendant enjoys a reasonable expectation of privacy does not turn solely upon the defendant's subjective belief but also depends upon (1) the defendant's interest in and control of the place searched, (2) any measures the defendant took to ensure privacy, and (3) whether society recognizes the defendant's expectation as reasonable. United States v. Padin, 787 F.2d 1071, 1075-76 (6th Cir.), cert. denied, 479 U.S. 823 (1986).

As noted above, neither party presented any evidence on the suppression issues at the March 15 motion hearing. Accordingly, the Court must derive the relevant "facts" from the sworn affidavits of Agent Jason Dobbs. In the affidavit supporting the Defendant's Criminal Complaint [Doc. 3], Agent Dobbs states that the pole "camera was installed on a public utility pole with a view of the rear of the residence located at 391 Barnard Narrows Road in Ten Mile, Tennessee." This affidavit explains that the mobile home located at 391 Barnard Narrows Road was the residence of the Defendant and Leon Houston's father, until his death in 2012. The affidavit supporting the criminal complaint states that the "camera also provides a view of the surrounding fields and roadways around the residence."

8

In Agent Dobbs' affidavit supporting the December 19, 2012 search warrant authorizing the continued use of the pole camera [Exh. 1], 391 Barnard Narrows Road is described as the residence of Leon Houston. However, the three residences–373, 391, and 412 Barnard Narrows Road–are all located on what is referred to as Houston family property. This affidavit states that all three residences are "owned, possessed, occupied, controlled or accessed" by the Defendant. In addition to including the same information as the affidavit to the Criminal Complaint about the view from the pole camera, this affidavit adds that the "camera also captures a limited view of the residence located at 373 Barnard Narrows Road[,]" which it identifies as the Defendant's residence. Finally, although 391 Barnard Narrows Road is Leon Houston's residence, the search warrant affidavit states that the Defendant spends "every day in and around 391 Barnard Narrows Road with only occasional, short trips back to his residence" at 373 Barnard Narrows Road. Although the affidavit states that the Defendant sleeps at 373 Barnard Narrows Road, it relates that the Defendant "may occasionally sleep at 391 Barnard Narrows as he was observed at 391 Barnard Narrows very early in the morning on at least one occasion without being observed coming from his residence."

In the instant case, the Court finds that due to the frequency of his visits to his brother's residence and the fact that he may have been an occasional overnight guest there, sufficient evidence exists that the Defendant has a recognized privacy interest in 391 Barnard Narrows Road. An overnight social guest has a reasonable expectation of privacy in another's home where he or she is staying because people naturally seek a secure and private place to sleep when they are away from their own home. Minnesota v. Olson, 495 U.S. 91, 98-99 (1990). In contrast, the Supreme Court has held that individuals in a business acquaintance's apartment for the first time to package cocaine for resale for two and one-half hours were not the equivalent of overnight guests and did not have

a legitimate expectation of privacy in the apartment.  <u>Minnesota v. Carter</u>, 525 U.S. 83, 89 (1998).

The Supreme Court provided the following guidance in <u>Carter</u>:

> Respondents here were obviously not overnight guests, but were essentially present for a business transaction and were only in the home a matter of hours.  There is no suggestion that they had a previous relationship with Thompson [the lessee], or that there was any other purpose to their visit.  Nor was there anything similar to the overnight guest relationship in <u>Olson</u> to suggest a degree of acceptance into the household.  While the apartment was a dwelling place for Thompson, it was for these respondents simply a place to do business.
>
> . . . .
>
> If we regard the overnight guest in <u>Minnesota v. Olson</u> as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely "legitimately on the premises" as typifying those who may not do so, the present case is obviously somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights.

<u>Id.</u> at 90-91.

In <u>United States v. Pollard</u>, the Sixth Circuit examined the standing of two defendants who were in another person's home conducting a cocaine transaction.  215 F.3d 643, 647 (6th Cir. 2000). After reviewing the privacy interests of overnight guests from <u>Olson</u> and business invitees from <u>Carter</u>, the appellate court determined that Defendant Pollard had standing to contest the search because he had been a friend of the lessee for seven years, had been staying in the home from time to time and earlier that same week, kept some clothing at the residence, ate meals with the family in the residence on occasion, and was allowed to stay at the residence even when the family was not

10

there. Id. at 647-48.  However, the court held that Defendant Rodriguez, who had never been to the residence before, did not know the lessee, did not bring any personal belongings or luggage to the house, and was returning to his home in another state immediately after the drug transaction, did not have a legitimate privacy interest in the residence to challenge the search. Id. at 648.

In weighing the relevant factors in the instant case, the Court finds that the Defendant does have a privacy interest that society would recognize in his brother's home and curtilage.  First, he has a familial relationship with the resident.  Second, he visits the mobile home daily and spends most of each day there.  Additionally, the Defendant may occasionally sleep at the mobile home.  Moreover, the search warrant affidavit suggests that the Defendant, along with his brother, took steps to control access to 391 Barnard Narrows Road by parking vehicles in the driveway to block entry to the residence from the public road.  Although the singular fact that the Defendant and Leon Houston are brothers would not alone give the Defendant a privacy interest in the mobile home,  the information available to the Court does not suggest that the Defendant was at the mobile home for a purely commercial purpose.  See id.; see also United States v. Buckner 717 F.2d 297, 300 (6th Cir. 1983) (concluding that the defendant's relationship with the apartment lessee *alone* did not provide standing to contest the search of his mother's apartment); cf., United States v. Heath, 259 F.3d 522, 533 (6th Cir. 2001) (determining that defendant had standing to contest the search of his cousin's apartment, because in addition to the familial relationship, the defendant had stayed there weekly for two years and had a key and "unfettered access" to the apartment).  Accordingly, the Court finds that the Defendant has standing to challenge the video surveillance of his brother's curtilage.

11

Generally, the curtilage of a home, which is "the land immediately surrounding and associated with the home," is afforded the same protection that the Fourth Amendment extends to the home. <u>Oliver v. United States</u>, 466 U.S. 170, 179 (1984). "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' . . . , and therefore has been considered part of home itself for Fourth Amendment purposes." <u>Id.</u> (quoting <u>Boyd v. United States</u>, 116 U.S. 616, 630 (1886)).[6] Nevertheless, "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." <u>Ciraolo</u>, 476 U.S. at 213. Thus, the Supreme Court has held that the aerial observation of a fenced backyard was not subject to the warrant requirement of the Fourth Amendment. <u>Id.</u> at 214. In so holding, the Court observed that an individual growing marijuana in his backyard cannot assume that his conduct will not be viewed "by a passing aircraft–or by a power company repair mechanic on a pole overlooking the yard." <u>Id.</u> at 215. Yet, the Court warned that either physical intrusion or advances in technology that disclosed otherwise unseen activities to law enforcement could render aerial observation "'invasive.'" <u>Id.</u>

At the time that the pole camera in the instant case was installed on October 9, 2012, only a few courts had examined the issue of whether video surveillance of curtilage was a search that implicated the Fourth Amendment. The Tenth Circuit has held that the "use of video equipment and

---

[6]In contrast, open fields, even if fenced and posted with signs proscribing trespass, are not protected by the Fourth Amendment: "[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." <u>Oliver</u>, 466 U.S. at 178 (affirming the open fields doctrine).

cameras to record activity visible to the naked eye does not ordinarily violate the Fourth Amendment." United States v. Jackson, 213 F.3d 1269, 1280 (10th Cir.), jmt vacated on other gnds, 531 U.S. 1033 (2000). In Jackson, the Court analyzed the warrantless use of two video cameras installed on telephone poles, which law enforcement used to observe two residences. The cameras had a zoom function and could be remotely adjusted but could not be used to see into the houses and did not record sound. Id. at 1276. Observing that the protection under the Fourth Amendment does not extend to activity that one knowingly exposes to the public, the court reasoned that the cameras at issue could not be used to see inside the houses and could only see what any passerby could see. Id. at 1281. Accordingly, the court determined that the defendants had no reasonable expectation of privacy in what the cameras recorded. Id. The undersigned notes that the length of the video surveillance, which extended over several months, see id. at 1277-78, was not at issue in Jackson.

Likewise, the Eastern District of Wisconsin also ruled that video surveillance of a driveway in front of a house did not implicate the Fourth Amendment because the camera, installed on a utility pole, did not permit law enforcement to see anything not otherwise visible through "traditional, street-level surveillance techniques." United States v. Urbina, No. 06-CR-336, 2007 WL 4895782, *7 (E.D. Wis. Nov. 6, 2007), adopted by United States v. Aguilera, No. 06-CR-336, 2008 WL 375210 (E.D. Wis. Feb. 11, 2008). Although the court expressed concern over the potential for abuse of video surveillance, it found that the video surveillance at issue captured no footage not "otherwise exposed to public view":

> If the investigative agents had chosen to utilize traditional surveillance methods and parked across the street and simply monitored the persons coming and going from the defendant's residence, it is unlikely that such actions would have inspired a motion to suppress; such actions are clearly constitutional. However,

13

such traditional surveillance methods are distinct from the omnipresence of a covert surveillance camera. "[I]t [is] unarguable that television surveillance is exceedingly intrusive . . . and inherently indiscriminate, and that it could be grossly abused to eliminate personal privacy as understood in modern Western nations." United States v. Torres, 751 F.2d 875, 882 (7th Cir.1984). "This type of surveillance provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state." United States v. Nerber, 222 F.3d 597, 602 (9th Cir. 2000) (quoting [United States v. ]Cuevas-Sanchez, 821 F.2d [248, 251 (5th Cir. 1987)]).

There are many legitimate reasons for this court and the general public to be concerned about indiscriminate law enforcement video surveillance, particularly if it is aimed at private homes. Turning to the specific facts of this case, those valid privacy concerns are not implicated. The court finds that the fact that law enforcement chose to install a surveillance camera, as opposed to utilizing more traditional surveillance techniques, does not change the result from a Fourth Amendment perspective.

Id. at *6-7; see also United States v. Nowka, No. 5:11–CR–474–VEH–HGD, 2012 WL 6610879, *5 (N.D. Ala. Dec. 17, 2012) (holding eight-month warrantless surveillance of defendant's yard and driveway from camera mounted on utility pole was not a search under Fourth Amendment because defendant has no reasonable expectation of privacy in view, "which any person could see from the public street"); United States v. Brooks, No. 11-2265-PHX-JAT-003, 2012 WL 5984804, *7 (D. Ariz. Nov. 28, 2012) (holding five-month warrantless video surveillance of apartment complex parking lot and stairwells with pole camera did not violate Fourth Amendment because defendant had no reasonable expectation of privacy in area open to public view).

In contrast, the Fifth Circuit recognized that when an individual manifests a subjective expectation of privacy in curtilage, such as by enclosing the area with a ten-foot tall fence that blocks the view from the street, then video surveillance constitutes a search under the Fourth Amendment.

14

United States v. Cuevas-Sanchez, 821 F.2d 248, 251 (5th Cir. 1987). In Cuevas-Sanchez, law enforcement suspected that the defendant's home was a stash house for illegal narcotics. Id. at 249. Agents sought and received a court order authorizing thirty days of video surveillance and directing the agents to minimize observation of innocent conduct and to stop surveillance when none of the suspects were at the residence. Id. at 249-50. Agents installed a video camera on a utility pole overlooking the fence surrounding the defendant's backyard. Id. at 250. The court rejected the government's argument that the video surveillance of curtilage is not a search, holding that the defendant had fenced his backyard to screen it from public view, that the defendant's backyard was within his curtilage, and that the defendant's expectation that he would be free of continuous video surveillance from above his fence was reasonable. Id. at 251. In so holding, the court distinguished the facts before it from the situation of the one-time, flyover in Ciraolo: "It does not follow that Ciraolo authorizes any type of surveillance whatever just because one type of minimally-intrusive aerial observation is possible." Id. Concluding that the video surveillance was a search under the Fourth Amendment, the court approved the issuance of an order under the statutory standards relating to wiretaps. Id. at 251-52 (determining that the standards set forth in 18 U.S.C. §§ 2510-20 "protect the constitutional rights of those under surveillance").

In January 2012, the Supreme Court examined whether affixing a Global Positioning System (GPS) tracking device to a vehicle and monitoring the vehicle's movements on public roadways constituted a search under the Fourth Amendment. United States v. Jones, 132 S. Ct. 945 (2012). Justice Scalia, writing for the majority, determined that the development in Katz of the "reasonable expectation of privacy" standard did not repudiate earlier Fourth Amendment jurisprudence preventing the government's warrantless trespass upon individuals, homes, papers, and effects. Id.

at 950-51.  Because the defendant's vehicle was an "effect," the placement of a GPS tracking device on its undercarriage for the purpose of gathering information was a search under the Fourth Amendment.  Id. at 951.  In so holding, the lead opinion states that "[t]his Court has to date not deviated from the understanding that mere visual observation does not constitute a search."  Id. at 953.  Additionally, whether a particular government action constitutes a search has traditionally not turned upon whether the action occurred over a certain time period or related to the investigation of a certain type of crime.  Id. at 954.

However, in her concurring opinion, Justice Sotomayor observed that GPS monitoring can occur without a physical trespass and agreed with the four justices who concurred in the judgment only "that, at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'"  Id. at 955 (Sotomayor, J., concurring).  "[B]ecause GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: 'limited police resources and community hostility.'"  Id. at 956 (Sotomayor, J., concurring) (quoting Illinois v. Lidster, 540 U.S. 419, 426 (2004)).  Moreover, "[a]wareness that the Government may be watching chills associational and expressive freedoms."  Id.  Although noting that whether electronic monitoring without physical trespass constitutes a search is a question for another day, Justice Sotomayor warned:

> More fundamentally, it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.  E.g., Smith[ v. Maryland], 442 U.S.[ 735, 742 (1979)]; United States v. Miller, 425 U.S. 435, 443 . . . (1976).  This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane

16

tasks. . . . . But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

Id. at 957 (Sotomayor, J., concurring).

Thus, at the time that agents installed the pole camera in question in this case, silent video surveillance of unobstructed curtilage, which did not involve a physical trespass and did not permit law enforcement to see or discern what was happening within the home, was not deemed to be a search under the Fourth Amendment. Although five members of the Supreme Court in Jones questioned the constitutionality of extended electronic monitoring of a vehicle,[7] the opinion did not contradict the Court's prior reasoning in Ciraolo that the Fourth Amendment does not require officers to ignore what any passerby can view from a public street. See Ciraolo, 476 U.S. at 213.

On December 19, 2012, the Court of Appeals for the Sixth Circuit affirmed the convictions of a former mail carrier relating to misrepresentations regarding her physical abilities in order to receive disability payments. United States v. Anderson-Bagshaw, No. 12-3074, 2012 WL 6600331 (6th Cir. Dec. 19, 2012) (not for publication in Federal Reporter), cert. denied No. 12-9360, 2013 WL 1187001 (Apr. 22, 2013). Although agents conducted some in-person, physical surveillance of the defendant, including while she was on a cruise, physical surveillance of her home was challenging because she lived on a busy highway in a rural area and the view of her backyard from the road was blocked by foliage. Id. at 3. Agents installed a video camera on a utility pole by the

---

[7]Justice Sotomayor observed that the "unique attributes of GPS surveillance" must be considered because "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." Jones, 132 S. Ct. at 955.

17

public highway in front of the defendant's home.  Id.  The pole camera, which streamed a live image

to agents over the internet for just over three weeks, could pan and zoom but could not view the

inside of the defendant's house or barn.  Id.

The Sixth Circuit acknowleged that "[l]aw enforcement officers may observe a home's

curtilage 'from a public vantage where [they] have a right to be and which renders the activities

clearly visible.'"  Id. at *6 (quoting Ciraolo, 476 U.S. at 213).  The court found that the view from

pole camera "was equally as good from the ground level" and that "the camera was placed at the top

of the pole for technical reasons, and not to improve the vantage point."  Id. at *7.  Nevertheless, the

court expressed its "misgivings about a rule that would allow the government to conduct long-term

video surveillance of a person's backyard without a warrant[,]" because a resident would not expect

that "the government can constantly film their backyard for over three weeks using a secret camera

that can pan and zoom and stream a live image to government agents."  Id.  The court opined that

such a scenario "'provokes an immediate negative visceral reaction'" reminiscent of the Orweillian

state.  Id. (quoting Cuevas-Sanchez, 821 F.2d at 251).  "Ultimately," given the evidence from the

physical surveillance of the defendant, the court held "that any possible Fourth Amendment violation

here would be harmless" and "decline[d] to decide whether long-term video surveillance of curtilage

requires a warrant."  Id. (stating that it would not announce a "new rule" where any Fourth

Amendment violation was harmless).[8]

---

[8]In her concurring option, Judge Karen Nelson Moore stated that she "would hold that the video surveillance obtained using the pole camera in this case was an unreasonable search which violated [the defendant's] Fourth Amendment rights."  Id. at *25.  Judge Moore opined that continuous and long-term video surveillance is "different from and far more intrusive" than physical police surveillance or limited police flyovers because it renders law enforcement's presence invisible, allowing officers to observe more than they could in person.  Id. at *23-25.

18

After surveying this case law, the Court finds that although officers may view curtilage by video camera if they could enjoy the same view in person, both live and remote surveillance are circumscribed by the Fourth Amendment. First, a video camera cannot be used to look inside or otherwise reveal what is occurring inside a residence. Kyllo v. United States, 533 U.S. 27, 40 (2001) (holding that "[w]here, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant"). Second, a video camera cannot be used to overcome a physical barrier–either natural or constructed–that would block an officer's physical observation of the curtilage from a public street. See Cuevas-Sanchez, 821 F.2d at 251. Third, the Court questions whether a video camera can be used to track continuously and indefinitely (i.e., without a time limitation) a person's every movement within their curtilage–a location entitled to the same Fourth Amendment protection as the home–without law enforcement first submitting the duration and circumstances of the surveillance for neutral judicial review.[9] See Anderson-Bagshaw, 2012 WL 6600331, *7. Thus, the Court will apply these factors to the case at hand.


*(3) Application*

Whether an area constitutes curtilage is determined by looking to "the unique facts of each case." Anderson-Bagwell, 2012 WL 6600331, at *6; Daughenbaough v. City of Tiffin, 150 F.3d

---

[9]The appellate court in Anderson-Bagshaw did not provide guidance on how a search warrant must limit and regulate extended video surveillance in order to comply with the Fourth Amendment. In this regard, the Court agrees with the Fifth Circuit in Cuevas-Sanchez that the statutory protections provided in Title III with regard to wiretaps would serve to protect the constitutional rights of those subjected to video surveillance as well. 821 F.2d at 251-52.

594, 598 (6th Cir. 1998). Each case is evaluated in light of four factors:

> (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by.

United States v. Dunn, 480 U.S. 294, 301 (1987); Anderson-Bagwell, 2012 WL 6600331, at *6.

Nevertheless, the primary consideration is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Dunn, 480 U.S. at 301; Anderson-Bagwell, 2012 WL 6600331, at *6.

In the instant case, based upon an aerial photograph attached to the search warrant [Exh. 1, p.25], the Court finds that most of the area within the view of the pole camera was pastures or fields. Neither the Defendant nor Leon Houston have a reasonable expectation of privacy in the open fields on the Houston property. See Oliver, 466 U.S. at 178; Anderson-Bagshaw, 2012 WL 6600331, at *6 (holding that video surveillance of barnyard and pasture "did not constitute a Fourth Amendment search"). Agent Dobbs' affidavit supporting the search warrant for the pole camera states that (1) on October 20, 2012, the Defendant "was observed in the field across from the farmhouse [at 412 Barnard Narrows Road] with what appeared to be a rifle" [Exh. 1, p.12, ¶19], (2) also on October 20, 2012, the Defendant "was seen driving a tractor to the field beside 391 Barnard Narrows Road. While stopped at the end of the driveway, he held what appeared to be a rifle up to his shoulder" [Exh. 1, p.12, ¶20], (3) on November 5, 2012, the Defendant "was observed with what appeared to be a rifle across the road from 391 Barnard Narrows Road" [Exh. 1, p.13, ¶24] , and (4) on November 20, 2012, the Defendant "was observed walking from his residence located at 373 Barnard Narrows Road to 391 Barnard Narrows Road with what appeared to be a rifle slung over

20

his shoulder" [Exh. 1, p.14, ¶27]. The Court finds that this video footage is not subject to suppression.

The area immediately adjacent to the mobile home at 391 Barnard Narrows Road, however, must be analyzed with regard to the four factors enumerated in Dunn. This area is in close proximity to the mobile home. Although the Court cannot tell from the aerial photograph whether the area in close proximity to the mobile home is fenced, any fencing in no way blocks the view of the residence and curtilage from either Barnard Narrows Road or Dogtown Road. The Court finds that the foliage around the front of the mobile home creates a natural enclosure on the side of the residence closest to Barnard Narrows Road. Anderson-Bagshaw, 2012 WL 6600331, at *6 ("[n]atural barriers can form an 'enclosure' for purposes of curtilage"). The Court has no information as to the nature of the uses to which the area in close proximity to the mobile home is put, other than the statements in the search warrant affidavit that the Defendant and Leon Houston were observed via the pole camera target shooting there. Finally, the Court knows of no precautions that the Defendant and Leon Houston have taken to prevent others from observing the yard immediately around the mobile home. In fact, the Defendant and his brother have invited the public to look onto the property in front of the mobile home by posting a series of large signs or billboards with statements about public officials on the property near the road.[10] Although two of the factors suggest the area should not be treated

---

[10]On April 19, 2013, the Defendant filed a document entitled Evidence in Case No. 3:13-CR-9 [Doc. 55] and containing twelve photographs with no caption or supporting explanation. The Court infers that the majority of these photographs are close ups of the billboards on Leon Houston's property. These signs, which are written in all capital letters, primarily contain a list of persons designated as "terrorist[s]" and complaints about various public officials. One photograph depicts a portion of a barbed wire fence at an unknown location. Another picture is of a water heater tank bearing Leon Houston's house number and what appears to be a no trespassing sign. Exhibit 2 introduced at the April 16, 2013 motion hearing in Leon Houston's case is a photograph of the driveway to Leon Houston's property taken from the pole camera.

21

as curtilage, the Court finds that the yard around the mobile home is "intimately tied" to the mobile home itself and is, therefore, within the curtilage of the residence.

The Court's "conclusion that the [yard immediately adjacent to the mobile home] is curtilage does not end [the] analysis, since law enforcement officers are entitled to observe things in plain sight from publicly accessible areas." Anderson-Bagshaw, 2012 WL 6600331, at *6. However, the agents are only allowed to observe whatever any passer-by could see from the streets. Based upon the aerial photograph attached to the search warrant affidavit, it appears to the Court that an agent standing on the ground along either Barnard Narrows Road or Dogtown Road would have an unobstructed view of the back yard of 391 Barnard Narrows Road and the front yard between the road and the tree line, but would not be able to see within the natural enclosure formed by the trees. Accordingly, video footage of the rear of 391 Barnard Narrows Road and the front between the road and the tree line would not be subject to suppression, provided that the duration and circumstances of the video recording are reasonable.

Although the precise length of reasonable warrantless video surveillance has not been established, the Sixth Circuit in Anderson-Bagwell has suggested that three weeks is too long. No. 12-3074, 2012 WL 6600331, at *7 (observing that "few people . . . would expect that the government can constantly film their backyard for over three weeks" without a search warrant); see also Jones, 132 S.Ct. at 964 (Alito, J., concurring in jmt) (observing that the Court "need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely

---

This photograph shows what appears to be a water heater tank on the grass at the corner of the intersection of Leon Houston's driveway and Barnard Narrows Road. To the extent that these photographs submitted by the Defendant are relevant to his suppression motions, the Court finds that they show that the Defendant and Leon Houston invited the public to look at the property by posting large signs near the road.

crossed before the 4-week mark").  Additionally, the Court has no information that the agents attempted to limit the intrusiveness of the video surveillance, other than limiting monitoring of the camera to "daylight hours." [Exh. 1, p.11, ¶14]  For example, Agent Dobbs' affidavits do not state that the agents stopped monitoring the camera when others besides the Defendant and his brother Leon Houston were at the property.  Instead, the Government's supplemental brief relates that other family members were filmed when they were with the Defendant and his brother.  Accordingly, the Court finds that the warrantless video surveillance of the curtilage of 391 Barnard Narrows Road, beyond fourteen (14) days violated the Defendant's reasonable expectation of privacy.

*(4) Good Faith*

The Government contends that the Defendant's arguments for suppression of all evidence stemming from the pole camera footage turns upon the propriety of the warrantless surveillance from October 9 through December 19, 2012.  It argues that during that time and up until the Sixth Circuit's opinion in United States v. Anderson-Bagshaw, *no court* had ever held that agents must first seek a search warrant before installing a pole camera on a public utility pole.  Instead, other courts had upheld such warrantless surveillance.  Jackson, 213 F.3d at 1280; Urbina, 2007 WL 4895782, *7.  Thus, the Government concludes that the instant ATF agents could not have known that a search warrant was required, prior to the Anderson-Bagshaw opinion.  The day that the Anderson-Bagshaw opinion was entered, ATF Agent Dobbs sought a search warrant for the continued use of the pole camera, even though the discussion of video surveillance in Anderson-Bagshaw was dicta.  The Government argues that because the agents acted in reliance on the fact that no legal precedent required a search warrant for video surveillance of curtilage prior to December

23

19, 2012, the exclusionary rule should not be employed to suppress the video footage in this case. The Defendant argues that the ATF agents did not act in good faith in conducting the warrantless video surveillance because on October 23, 2012, agents caused the pole camera to zoom in on his neighbor who was not even a subject of their investigation. "The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." United States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000); see also Mapp v. Ohio, 367 U.S. 643, 654 (1961) (holding that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); Weeks v. United States, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment). However, not every Fourth Amendment violation results in the exclusion of the evidence obtained. See Herring v. United States, 129 S. Ct. 695, 700 (2009). Exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" Id. at 699 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," Evans, 514 U.S. at 11, and where it "results in appreciable deterrence." Herring, 129 S. Ct. at 700 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)) (internal quotation marks omitted). "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs." Herring, 129 S. Ct. at 700 (quoting Illinois v. Krull, 480 U.S. 340, 352-53 (1987)). In the end, the decision to suppress evidence "turns on the culpability of the police and the potential for exclusion to deter wrongful police conduct." Id. at 698.

Thus, the courts have recognized that certain Fourth Amendment violations do not involve

24

law enforcement officers' own misconduct and that excluding evidence in those cases would not deter wrongful police conduct. As such, a number of "good faith" exceptions to the exclusionary rule have developed. These include (1) reliance on a search warrant that is later found to be unsupported by probable cause, Leon, 468 U.S. at 922; (2) reliance on a search warrant that contains clerical errors, Massachusetts v. Sheppard, 468 U.S. 981, 991 (1984); (3) reliance on a statute with a constitutional defect that was not "sufficiently obvious," Krull, 480 U.S. at 349-50; and (4) reliance on mistaken data or information from a judicial employee, Arizona v. Evans, 514 U.S. 1, 15 (1995). See also Herring, 129 S. Ct. at 701. In Davis v. United States, the Supreme Court recently recognized a good faith exception for officers "conduct[ing] a search in objectively reasonable reliance on binding judicial precedent[.]" 131 S. Ct. 2419, 2428-29, 2434 (2011).

Here, at the time that ATF agents installed the pole camera to conduct video surveillance of the Houston family property, no court had required a search warrant to conduct video surveillance of unobstructed curtilage. On the other hand, the Court of Appeals for the Tenth Circuit and the District Court for the Eastern District of Wisconsin had both affirmed warrantless video surveillance. Jackson, 213 F.3d at 1280; Urbina, 2007 WL 4895782, *7. Notably, the Supreme Court in Jones had held that the installation and monitoring of a GPS tracking device is a search despite the fact that the device only disclosed information that was already displayed to the public. However, the Jones decision was limited to GPS trackers, which Justice Sotomayor observed reveal more about the intimate associations of the individual than "lawful conventional surveillance techniques." Jones, 132 S. Ct. at 955-56 (Sotomayor, J, concurring). Lawful video surveillance of curtilage, on the other hand, should reveal only the same information that could be gained by in-person or conventional police surveillance. Thus, the Court questions whether even the most foresighted agent would have

25

viewed <u>Jones</u> as an indication that a search warrant was required for a pole camera.

In any event, the Court finds that the ATF agents acted in good faith in the instant case. They had no prior precedent stating that a search warrant was required, and they sought a search warrant the day that the Sixth Circuit filed the <u>Anderson-Bagwell</u> case. Like the officers in <u>Davis</u>, the instant ATF agents "did not violate [the Defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence." <u>Id.</u> at 2428. The Defendant argues that law enforcement's bad faith is evident because agents used the pole camera to observe a neighbor, who was not a subject of the investigation, on October 23, 2012. The Court finds this limited observation of a third party does not alter the analysis.[11] Thus, suppression of the video footage in this case would not serve to deter future Fourth Amendment violations. Moreover, the societal cost of suppressing "reliable, trustworthy evidence bearing on guilt or innocence" would be high. <u>Id.</u> at 2427. Accordingly, the Court finds that the "deterrence benefits from suppression" do not outweigh the cost to society, <u>see id.</u>, and the exclusionary rule should not be applied in this case. The Court recommends that the Defendant's motion to suppress the footage from the warrantless video surveillance be denied.

### B. December 19, 2012 Search Warrant Authorizing Pole Camera

On December 19, 2012, ATF Agent Jason Dobbs sought a search warrant authorizing the continued video surveillance of the Houston family property from the pole camera already in use. United States Magistrate Judge H. Bruce Guyton issued a search warrant for the continued use of

---

[11]The Court notes that during the suppression hearing in the Defendant's brother Leon Houston's case, Agent Dobbs testified that the Defendant's neighbors, the Johnsons, were seen on the camera when they came to visit Leon Houston, which they did regularly. [Case No. 3:13-CR-13, Doc. 93, Tr. at 79] The Court has no evidence that agents used the pole camera in this case to conduct video surveillance of property other than the Houston family property.

26

the pole camera on that same day. The Defendant asks the Court to suppress the video footage gained after December 19, 2012, because he contends that the search warrant (1) was not issued by a neutral and detached judge and (2) was not supported by probable cause.

*(1) Neutral and Detached Magistrate*

To comport with the Fourth Amendment, the judge issuing a search warrant must be "neutral and detached." Shadwick v. City of Tampa, 407 U.S. 345, 350 (1972); United States v. Beals, 698 F.3d 248, 264 (6th Cir. 2012). "Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." Shadwick, 407 U.S. at 350. A search pursuant to a warrant issued by a judicial officer lacking in neutrality "stands on no firmer ground than if there had been no warrant at all." Coolidge v. New Hampshire, 403 U.S. 443, 453 (1971). In order to determine whether the issuing judge was neutral and detached, the Court looks to the particular circumstances involved in the issuance of the search warrant in question. United States v. Guthrie, 184 F. App'x 804, 806 (10th Cir. 2006).

The Defendant argues that Judge Guyton could not issue the instant search warrant because he had a conflict of interest and an "extreme and severe hatred, prejudice and personal bias" against the Defendant and his brother. [Doc. 29, p.1] The Defendant states that the conflict and bias are evidenced by (1) Judge Guyton's previous recusal in a civil rights case filed by the Defendant's brother, Clifford Leon Houston v. James F. Logan Jr., et al., 3:12-mc-2, and (2) Judge Guyton's being named as a defendant in another civil rights case, Clifford Leon Houston v. Stacia Hilton, et al, 3:12-mc-8, filed by Leon Houston on February 7, 2012, seeking twenty-five million dollars in damages. The Government responds that the Defendant has failed to show any bias or prejudice on

the part of Judge Guyton.

"The Sixth Circuit has identified two situations in which a magistrate will not be considered 'neutral and detached': (1) when she has a personal, direct or monetary interest in the outcome of the case; or (2) she is acting primarily in a law-enforcement capacity." United States v. Todd, No. 3:05cr00090, 2008 WL 542972, *4 (M.D. Tenn. Feb. 25, 2008) (citing United States v. Bowers, 828 F.2d 1169, 1174-75 (6th Cir. 1987)). Moreover, the "'judge's alleged bias must emanate from some extrajudicial source rather than from participation in judicial proceedings.'" Id. (quoting Bowers, 828 F.2d at 1175); see also United States v. Montgomery, 395 F. App'x 177, 186 (6th Cir. 2010) (observing that "opinions formed by judges based on what they learned in earlier proceedings does not qualify as bias or prejudice"). In Todd, the defendant argued that the judge issuing the search warrant was not neutral and detached because she had previously decided that he was not credible, based upon his testimony before her in another case. Id. The court found that the Defendant's allegation (that the judge had previously formed a negative opinion of his credibility) did not show "a personal or direct interest in the outcome of his case" or that the judge was acting essentially as law enforcement. 2008 WL 542972, at *4. Moreover, the judge's opinion of the Defendant's credibility had no bearing upon whether she found the affiant to be credible, and the court found that the search warrant was "clearly supported by probable cause." Id. Thus, the court in Todd held that the allegations of bias were "not sufficient to overcome the presumption that [the judge] acted as a 'neutral and detached magistrate' when she issued the search warrant." Id. at *5.

In the instant case, the Defendant argues that Judge Guyton has a personal and monetary interest in the outcome of the instant case and issued the search warrant in retaliation for the civil lawsuits by Leon Houston. In support of this contention, he argues that Judge Guyton in essence

admitted he had a conflict of interest by recusing himself in one of Leon Houston's civil cases. At the March 15 hearing, the Defendant also argued that anyone would feel hatred to the point of wanting to do violence to a person who had sued them for millions of dollars.

This Court has already determined [Doc. 53] that Judge Guyton's recusal in a previous civil matter does not mean that he is precluded from signing a search warrant in a subsequent criminal case. First, the previous civil lawsuit has nothing to do with the instant criminal charges. Second, Judge Guyton recused in Leon Houston's civil case, not the Defendant's. Third, Judge Guyton's act of recusal is not an extrajudicial source for the alleged bias. See Clifford Leon Houston v. Wicks, No. 11-6557, 2012 WL 5259166, *1 (6th Cir. Oct. 25, 2012) (holding that Leon Houston's "conclusory assertions of bias [relating to a judge's recusal in an earlier case by his brother] are not based on extrajudicial activity"). Accordingly, the prior lawsuit and Judge Guyton's recusal therefrom have absolutely nothing to do with the Defendant, nor do they show any bias toward the Defendant.

Additionally, the Defendant's bare allegation that Judge Guyton has a personal bias and hatred toward him and his family based upon his brother's lawsuits is unfounded and fantastical. The frivolity of this contention is underscored by the fact that both of the civil lawsuits, which the Defendant claims caused Judge Guyton to fear financial ruin and inspired a violent hatred of the Defendant's family, were terminated months before Judge Guyton signed the search warrant.[12] Thus, the Defendant has failed to demonstrate that Judge Guyton has a personal, direct, or monetary

---

[12]Clifford Leon Houston v. James F. Logan Jr., et al., 3:12-mc-2 [Doc. 5], was terminated on August 30, 2012. Clifford Leon Houston v. Stacia Hilton, et al., 3:12-mc-8, was terminated on March 16, 2012. Both of these lawsuits and others filed by Leon Houston were dismissed due to his failure to pay the filing fee or to move to proceed in forma pauperis. See also Clifford Leon Houston v. Jack Stockton, et al., 3:11-mc-25 [Doc. 3 at 13].

interest in the outcome of the instant case and has not overcome the presumption that Judge Guyton was neutral and detached. Finally, like the search warrant in <u>Todd</u>, the December 19, 2012 search warrant is supported by probable cause as discussed below.[11]

*(2) Probable Cause*

The Defendant also argues that probable cause did not exist to support the issuance of the December 19, 2012 search warrant authorizing the continued use of the pole camera. He argues that the information gained in violation of his Fourth Amendment rights during the warrantless pole camera surveillance cannot be considered in assessing probable cause. He contends that once the information from the video surveillance is removed from the search warrant affidavit, the remaining information from his sisters and a confidential informant fails to provide probable cause because the search warrant affidavit does not show that these individuals are reliable or that law enforcement corroborated their information. Finally, at the March 15 hearing, the Defendant argued that the agents waited many months after talking with his sisters and the confidential informant before seeking the search warrant. The Government responds that the search warrant is supported by probable cause, even without considering the warrantless video footage.

As set out above, the Fourth Amendment requires probable cause for the issuance of a search warrant. Probable cause to search is "a fair probability that contraband or evidence of a

---

[11]A search warrant issued by an individual without the legal authority to do so is "void *ab initio*," <u>United States v. Master</u>, 614 F.3d 236, 241 (6th Cir. 2010), which means that the Court never reaches the question of whether the search warrant is supported by probable cause. In this case, the Defendant does not contend that Judge Guyton lacked the legal authority to issue search warrants, only that his alleged bias against the Defendant prevented him from exercising that authority in a neutral fashion.

crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make

such a showing "requires only a probability or substantial chance of criminal activity, not an actual

showing of such activity." Id. at 244 n.13. Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely
> requires that the facts available to the officer would "warrant a man
> of reasonable caution in the belief," Carroll v. United States, 267 U.S.
> 132, 162, . . . (1925), that certain items may be contraband or stolen
> property or useful as evidence of a crime; it does not demand any
> showing that such a belief be correct or more likely true than false.
> A "practical, nontechnical" probability that incriminating evidence is
> involved is all that is required. Brinegar v. United States, 338 U.S.
> 160, 176, . . . (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds

for belief supported by less than prima facie proof but more than mere suspicion." United States v.

Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists

is evaluated by looking at the totality of the circumstances. Gates, 462 U.S. at 238.

The issuing judge's determination that probable cause exists is entitled to "'great deference.'"

United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (quoting Gates, 462 U.S. at 236). This

deferential standard promotes the preference for the use of search warrants as opposed to warrantless

searches. Id. "The task of the issuing magistrate is simply to make a practical, common-sense

decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair

probability that contraband or evidence of a crime will be found in a particular place." Gates, 462

U.S. at 238. The "duty of a reviewing court is simply to ensure that the magistrate had a substantial

basis for concluding that probable cause existed." Id. at 238-39. In making this determination, the

Court considers only the information that was before the issuing judge–in other words, only what

is contained within the four corners of the supporting affidavit. United States v. Hatcher, 473 F.2d

31

321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971).

The Court has determined above that although eight of the ten weeks of the warrantless video footage of Leon Houston's curtilage were gained in violation of the Defendant's Fourth Amendment rights due to the excessive duration of the warrantless video surveillance. Nevertheless, the Court also found that this video footage should not be subject to the exclusionary rule because the agents acted in good faith reliance on the absence of any court requiring a search warrant for long-term video surveillance of unobstructed curtilage. Therefore, the Court finds that the video footage from October 10, 2012, to December 19, 2012, does not have to be removed from consideration and provides probable cause to issue the search warrant authorizing continued use of the pole camera. According to the search warrant affidavit, this video footage shows the Defendant carrying and/or shooting firearms on the Houston family property on fourteen different days between October 11, 2012, and December 18, 2012. The affidavit also states that based upon Agent Dobbs prior training and experience, persons possessing firearms generally keep those firearms for years and often for a lifetime. [Exh. 1, p.14, ¶31] Thus, considering the warrantless video footage in full, the affidavit clearly provides probable cause that continuing video surveillance of the Houston family property would yield evidence of the Defendant being in possession of a firearm as a convicted felon in violation of 18 U.S.C. §922(g). However, even if the Court only considers the video footage of the Defendant's carrying and shooting weapons in the open pasture and within Leon Houston's curtilage from October 9 to October 23, 2012, the search warrant affidavit would provide probable cause to support the issuance of a search warrant authorizing continued video surveillance, as discussed below.

First, the search warrant affidavit provides information that the Defendant had a firearm in

32

the pasture areas of the farm on four occasions: (1) on October 20, 2012, the Defendant "was observed in the field across from the farmhouse [at 412 Barnard Narrows Road] with what appeared to be a rifle" [Exh. 1, p.12, ¶19], (2) also on October 20, 2012, the Defendant "was seen driving a tractor to the field beside 391 Barnard Narrows Road. While stopped at the end of the driveway, he held what appeared to be a rifle up to his shoulder" [Exh. 1, p.12, ¶20], (3) on November 5, 2012, the Defendant "was observed with what appeared to be a rifle across the road from 391 Barnard Narrows Road" [Exh. 1, p.13, ¶24] , and (4) on November 20, 2012, the Defendant "was observed walking from his residence located at 373 Barnard Narrows Road to 391 Barnard Narrows Road with what appeared to be a rifle slung over his shoulder" [Exh. 1, p.14, ¶27].  Additionally, the search warrant affidavit relates that the Defendant was filmed (1) target shooting in front of 391 Barnard Narrows Road on October 11, 2012, (2) walking to the side and rear of the trailer with a rifle on October 15, 2012; (3) target shooting in front of the trailer on October 20, 2012; and (4) standing outside the trailer with a handgun in his waistband on October 23, 2012. [Exh. 1, pp.11-12, ¶¶16-17, 20-21] As discussed above, the affidavit relates that individuals tend to retain firearms for years. Video footage of the Defendant's possession of firearms on the Houston family property on six days in October and November 2012, supports a finding that continued video surveillance of the area would provide additional footage of the Defendant possessing firearms.

Second, the affidavit provides information that on December 16, 2011, the Defendant's sister Lisa Burris told Roane County Sheriff Jack Stockton and District Attorney General Russell Johnson that whenever the Defendant left the family farm, "he was usually armed with a firearm" and that "there were numerous firearms on the property[.]" [Exh. 1, p.8, ¶6] The affidavit states that Ms. Burris requested a meeting with Sheriff Stockton and General Johnson because she believed that the

33

Defendant and Leon Houston were not properly caring for the siblings' elderly father. [Exh. 1, p.8, ¶6] The affidavit relates that in investigating this complaint by Ms. Burris, General Johnson interviewed a home healthcare nurse Ashley Long, who stated she had seen multiple firearms on the property in July 2011 while there caring for the Defendant's father. [Exh. 1, p.8, ¶7] Although Ms. Long recalled that Leon Houston was always armed when she saw him, she did not recall seeing the Defendant with a gun on his person. [Exh. 1, p.8, ¶7] The Court finds that this evidence lends support to a finding that continuing video surveillance of the Houston family property would disclose evidence of the Defendant possessing firearms because it shows that numerous firearms were present on the property and that the Defendant armed himself when leaving the property.

The Defendant challenges the use of this evidence in the probable cause equation, arguing that Ms. Burris is biased against him, that neither Ms. Burris nor Ms. Long are shown to be credible, reliable or corroborated by the police, and that the evidence was gained a year or more from when the search warrant issued. The Court finds that the information from Ms. Burris and Ms. Long were properly considered in the probable cause analysis. The fact that Ms. Burris had complained to law enforcement about the Defendant's care of their father is contained in the affidavit for the issuing judge to evaluate. Additionally, the credibility or reliability of known citizen witnesses does not have to be proven for their information to be considered. "Statements from a source named in a warrant application . . . are generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability." United States v. Lonnie Hodge, No. 12-1173, 2013 WL 1694437, *4 (6th Cir. Apr. 19, 2013); see also United States v. Miller, 314 F.3d 265, 269–70 (6th Cir. 2002); United States v. Pelham, 801 F.2d 875, 878 (6th Cir. 1986). Finally, although the Defendant suggests the information

34

that multiple weapons were on the property is stale because the agents waited a year or more before seeking a search warrant, guns have an enduring value to those who possess them and are likely to be retained for long time periods.  See United States v. Lancaster, No. 04-5826, 2005 WL 1799385, *5 (6th Cir. July 28, 2005) (determining that information from a confidential informant that he saw the defendant fire a machine gun two years earlier was not stale because "firearms are not perishable items").  Moreover, the observations of Ms. Burris and Ms. Long are corroborated by multiple sightings of the Defendant carrying a firearm in October and November 2012.  Accordingly, the Court finds that the information from Ms. Burris and Ms. Long is properly considered along with the totality of the evidence.

The affidavit in support of the search warrant also provides the following information from an interview with a confidential informant "who is a long-time acquaintance" of the Defendant and his brother and who was last on the Houston family property in April 2012: (1) The confidential informant has seen between fifteen and twenty firearms in both the Defendant's and Leon Houston's residences, (2) The Defendant carries two pistols in his waistband at all times, and (3) the Defendant is always armed when he leaves his property. [Exh. 1, p.9, ¶¶10-11] The affidavit relates that the confidential informant "has a criminal history and has served time in jail for criminal violations, therefore [the affiant] treat[s] him as an individual under the law whose credibility and reliability must be established by other corroborating evidence." [Exh. 1, p.9, ¶10] The affidavit provides the following corroboration of the confidential informant's information:  (1) Roane County Sheriff's Office staff confirmed that the Defendant drives a Ford Ranger pickup truck and Leon Houston drives a Chevrolet pickup truck that belonged to his father, as stated by the confidential informant; (2) The Roane County Sheriff confirmed that the Defendant's wife works at United Community

35

Bank, as stated by the confidential informant; (3) Agent Dobbs confirmed through viewing an aerial photograph of the property that the Houston brothers have barricaded the driveway, as stated by the confidential informant; and (4) Agent Dobbs verified that in April 2012, a plaintiff was awarded a $5.45 million dollar judgment against the Defendant and Leon Houston, supporting the confidential informant's statement that the Houston brothers told him they had lost a lawsuit and feared law enforcement would try to take their property in relation to this. The Defendant argues that law enforcement was only able to corroborate information that was readily available to the public.

Probable cause for the issuance of a search warrant may be gleaned from information provided by a confidential source but, in such cases, the issuing judge must have a basis for finding that the source is reliable or credible and was in a position to know the information provided, as part of the totality of the circumstances analysis. United States v. Dyer, 580 F.3d 386, 390 (6th Cir. 2009); see also Gates, 462 U.S. at 233 (holding that a confidential informant's reliability and basis of knowledge are "relevant considerations in the totality-of-the-circumstances analysis"); Allen, 211 F.3d at 972-73. An informant's veracity or reliability and basis of knowledge are not rigid categories. Id. Instead, deficiencies in one aspect can be made up by a strong showing in another. Gates, 462 U.S. at 232-33; Allen, 211 F.2d at 981. Additionally, information provided by a confidential informant can be independently corroborated by law enforcement. United States v. Jones, 159 F.3d 969, 974 (6th Cir. 1998). This independent police corroboration must be "substantial." United States v. Frazier, 423 F.3d 526, 532 (6th Cir. 2005). Police do not necessarily have to corroborate the criminal conduct observed by the informant; instead, corroboration of unincriminating facts can be sufficient to establish probable cause. Gates, 462 U.S. at 243-44. "It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of

36

information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Id. at 244-45 (quoting Jones v. United States, 362 U.S. 257, 269, 271 (1960)).

In the instant case, the confidential source had a first hand or eyewitness basis of knowledge regarding the Defendant's possession of weapons. The affidavit relates that he had "known the Houston brothers for many years," has been inside both the Defendant's and Leon Houston's residences, and was last at the Houston family property in April 2012. He knows that the Houstons keep multiple firearms in their residences because he has seen them there. This fact is corroborated by the eyewitness account of Ashley Long, the home healthcare nurse who was in Leon Houston's residence in July 2011, caring for the Defendant's father, and observed multiple firearms there. Additionally, the confidential informant's account that the Houston brothers go armed, always keeping two pistols in their waistbands, is corroborated by Nurse Long's statement that "Leon Houston was always armed, sometimes with as many as three handguns at his waist[.]" [Exh. 1, p.8, ¶7] Also, the confidential informant's statement that the Houston brothers never leave their property unarmed is corroborated by information in the affidavit from the Defendant's sister Lisa Burris, who related to law enforcement that the Defendant was usually carried a firearm whenever he left the family farm. These examples reveal both that the affidavit provided substantial corroboration of the confidential informant's information and that the corroboration was not solely from public sources.

Additionally, the level of detail provided in the confidential source's information supports a finding that the source is reliable. See United States v. Gunter, 551 F.3d 472, 480 (6th Cir. 2008) (considering as a factor supporting the informant's reliability that he provided detailed information of ongoing drug sales); United States v. McCraven, 401 F.3d 693, 697 (6th Cir. 2005) (determining

37

that "a detailed description of what the informant observed first-hand" is another "indicia of the informant's reliability"). In this case, the confidential informant provided detailed information about the weapons the Houston brothers carried on their person:

> [The confidential informant] said that both Leon and Rocky Houston always carry two pistols at all times, one in the front waistband and one in the back. Leon Houston carries a .40 or .45 caliber weapon in his back waistband, and a six-shot revolver in his front waistband. Rocky Houston carries .40 or .45 caliber weapons in a similar fashion.

The Court finds that the level of detail regarding the type of weapons carried by the Houstons and the location on their person where they carried these weapons supports the reliability of the confidential informant.

Finally, the affidavit contained independent police corroboration of some of the information provided by the confidential informant. As listed above, law enforcement corroborated the type of truck driven by the Defendant and his brother, the Defendant's wife's employer, that the Houston brothers had barricaded Leon Houston's driveway with vehicles, and that the Houstons had a significant civil judgment against them. The Defendant rejects this corroboration as relating only to innocent information available from public sources or by observation from the street. As discussed earlier, law enforcement does not have to corroborate criminal activity in order to provide probable cause. See Gates, 462 U.S. at 243-45 & n.13. In fact, the Supreme Court rejected this very argument in the seminal probable cause case of Illinois v. Gates:

> The Illinois Supreme Court thought that the verification of details contained in the anonymous letter in this case amounted only to "the corroboration of innocent activity," J.A. 12a, and that this was insufficient to support a finding of probable cause. We are inclined to agree, however, with the observation of Justice Moran in his dissenting opinion that "In this case, just as in Draper[ v. United

38

States, 538 U.S. 307, 309 (1959)], seemingly innocent activity became suspicious in the light of the initial tip." J.A. 18a. And it bears noting that all of the corroborating detail established in Draper, *supra*, was of entirely innocent activity-a fact later pointed out by the Court in both Jones v. United States, 362 U.S. 257, 269-270 . . . (1960), and Ker v. California, 374 U.S. 23, 36 . . . (1963).

> This is perfectly reasonable. As discussed previously, probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands. We think the Illinois court attempted a too rigid classification of the types of conduct that may be relied upon in seeking to demonstrate probable cause. See Brown v. Texas, 443 U.S. 47, 52, n. 2 . . . (1979). In making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts.

Id. at 243 n.13. In this case, the Court finds that the degree of suspicion attached to the information and acts corroborated by law enforcement, particularly with regard to firearms stored at the Defendant's residence and the fact that the Defendant was continuously armed, is high.

Accordingly, based upon the confidential informant's firsthand basis of knowledge, the level of detail in his information, and the corroboration provided by the statements of Ms. Burris and Nurse Long as well as law enforcement's corroboration of some of the details provided by the confidential informant, the Court finds that the confidential informant is reliable. Thus, the information from the confidential informant can and does support a probable cause finding in this case.

Considering the totality of the circumstances, including the video footage of the Defendant carrying firearms in the open pasture; the video footage of the Defendant shooting and carrying

39

firearms the weeks of October 9-23, 2012; and the information from Lisa Burris and the confidential informant that the Defendant went armed on the property, the Court finds that the issuing judge had ample basis to find probable cause to believe that the continued monitoring of the pole camera would provide evidence of the Defendant, a felon, in possession of firearms. This is true even if the video footage of the surveillance of curtilage from October 23 through December 18, 2012, is not considered. Accordingly, the Court recommends that the Defendant's request to suppress evidence from the December 19, 2012 search warrant be denied.

### C. January 11, 2013 Search Warrants

Finally, the Defendant ostensibly challenges the searches of the three residences on the Houston family property on January 11, 2013, because probable cause for those search warrants was based in part upon the warrantless video surveillance from October 9, 2012, to December 19, 2012. The Defendant claims that all evidence stemming in any way from the warrantless video surveillance is fruit of the poisonous tree and must be suppressed. The Court has already found in Part A above that because the ATF agents were acting in good faith when they installed and monitored the pole camera that none of the evidence resulting from the warrantless video surveillance should be subjected to the exclusionary rule. Additionally, the Court has found in Part B above that probable cause existed to issue the December 19, 2012 search warrant for the continued use of the pole camera, even excluding any evidence seized in violation of the Defendant's Fourth Amendment rights.

In support of the January 11, 2013 search warrants for 373, 391, and 412 Barnard Narrows Road, Agent Dobbs submitted an affidavit containing the information provided in his December 19

search warrant affidavit along with two additional sightings of the Defendant with a firearm observed from the pole camera on December 19 and December 22, 2012. The master affidavit also relates that Agent Dobbs saw the Defendant wearing what appeared to be a handgun in a holster while the Defendant was entering his car in a bank parking lot on January 7, 2013. Accordingly, the Court finds without question that it had probable cause to issue the search warrant for the Defendant's residence on January 11, 2013, even without considering the warrantless video footage from October 23 through December 18, 2013.

Although the Court questions whether the Defendant has standing to challenge the search of his daughter's residence at 412 Barnard Narrows Road and perhaps even the search of Leon Houston's residence at 391 Barnard Narrows Road,[12] the Court finds it unnecessary to conduct a standing analysis because the exclusion of the warrantless video footage would not lead to the suppression of evidence gained in these searches. Because these residences were searched on January 11, 2013, pursuant to search warrants, the probable cause for which existed even without the extended warrantless video footage, the evidence seized in these searches was not the fruit of the poisonous tree.

## III. CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds that the warrantless use of a pole camera to continuously observe

---

[12]The Court found in Part A above that as an overnight guest and daily visitor at 391 Barnard Narrows Road, the Defendant had standing to challenge the warrantless video surveillance of the curtilage of that residence. Arguably, the Defendant's connections to 391 Barnard Narrows Road would also allow him to challenge the search of that residence as well.

41

unobstructed curtilage on the Houston family property violates the Fourth Amendment. However, the Court finds that the Agents installing the pole camera acted in good faith and, thus, the exclusionary rule should not be applied in this case. Additionally, the Court finds that the subsequent search warrants issued on December 19, 2012, and January 11, 2013, were valid. Accordingly, the Court **RECOMMENDS** that the Defendant's motions [**Docs. 29 and Case No. 3:13-CR-10, 14 & 16**] should be **DENIED**.[13]   The Clerk of Court is **DIRECTED** to mail a copy of this report to the Defendant at the Knox County Jail.

Respectfully submitted,

<u>    s/ C. Clifford Shirley, Jr.    </u>
United States Magistrate Judge

---

[13]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).